Fabricant, J.
INTRODUCTION
This action arises from an agreement, made in 1969, granting owners of abutting property on Martha’s Vineyard reciprocal rights to purchase each other’s land at a predetermined price under certain circumstances. The plaintiffs now seek a declaration that the agreement is void as an unreasonable restraint on alienation. The defendants seek a contrary declaration, and have also counterclaimed for enforcement of a separate provision of the agreement barring certain uses of the property. The case is presently before the Court on the parties’ cross-motions for summary judgment as to the plaintiffs’ declaratory judgment claim, along with the defendants’ motion for partial summary judgment on their counterclaim. For *438 reasons that will be explained, the defendants’ motions will be granted.
BACKGROUND
The following facts are undisputed.[2] The plaintiffs are trustees of a real estate trust holding title to land in Edgartown, on Martha’s Vineyard, in an area known as Butler’s Neck.[3] The ultimate beneficiaries[4] of the trust are brothers Neil and Monte Wallace and members of their families. The Wallaces (through a trust) purchased 151 acres of their present holdings in 1969 from Benjamin Harrison Cohan and his wife, Hildegard Cohan (“the elder Cohans”), both of whom are now deceased. The sale left the elder Cohans with a house on a smaller parcel abutting the land transferred. Their son, Marshall Cohan, and his wife also owned a house on an abutting parcel, as did his sister, Janet Aldeborgh, and her husband. These four will be referred to herein collectively as “theyounger Cohans.” The Cohans all used these properties for summer vacations, as the younger Cohans and their families still do. The Wallaces’ purpose in purchasing the property was also to establish summer vacation homes for their families.
The agreement that is the subject of this case was executed contemporaneously with the transfer of the land from the elder Cohans to the Wallaces, on December 30, 1969. The parties to the agreement were the elder Cohans, the younger Cohans, and the Wallaces. The material provisions of the agreement were three. First, the Wallaces granted to each of the Cohan couples specified rights of way across the Wallaces’ land for access to the beach and to other bodies of water. Second, the parties agreed that, until January 1, 2010, as long as members of each family continued to own their property, "no use shall be made of’ any of their land “other than for detached single family residences . .. which residences shall not be designed, intended for use, or used primarily for the production of rental income to the owner thereof.”
Third, the Wallaces on the one hand, and the Cohans on the other, agreed that until January 1, 2010, they would not transfer any part of their land, other than within their own family, without first offering it for sale to those members of the other family who continued to own abutting property with houses. The terms of such sale, as specified in the agreement, were a fixed price per acre, plus the reproduction cost of any structure on the land. The price per acre was set at $7,000 until 1980, $8,000 until 1990, $9,000 until 2000, and $10,000 until 2010.
It is undisputed that this provision of the agreement originated with a request by the Wallaces, made in an effort to insure that they would be in a position to control development in the area. It is also undisputed that the Cohans proposed that the provision be reciprocal, to which the Wallaces agreed. The price per acre and the forty year term both originated with the Wallaces, and were agreed to with little or no negotiation. The initial price per acre of $7,000 was similar to the price the Wallaces were paying for the land they purchased from the elder Cohans.[5] To the extent that the parties remember, the price increase, at the rate of $1,000 per decade, did not arise from any actual analysis of market trends or the like. Inflation had been low in years prior to 1969.
The Wallaces built summer homes on the land and vacationed there with their families. At times they purchased additional abutting parcels that came up for sale. In 1970 or 1971, Janet and John Aldeborgh chose to sell four acres of their property. They offered the land to the Wallaces, pursuant to the agreement, and the Wallaces exercised their right to purchase it. In 1980 or 1981, Hildegard Cohan, through a financial representative, offered her land and house for sale to the Wallaces pursuant to the agreement. After some difficuliy in reaching agreement with her representative on the reproduction value of the house, the Wallaces exercised their rights under the agreement to purchase that property. Hildegard Cohan died in 1982, her husband having predeceased her. In 1988, after hearing that the Aldeborghs were putting their property up for sale, the Wallaces sent John Aldeborgh a letter stating that “we think it is appropriate that you be reminded that there is an agreement between us whereby we have the right to acquire the property on a predetermined formula.” Apparently no transaction followed that communication.
While the Wallaces and the younger Cohans continued to summer on their respective properties, apparently enjoying peaceful relations, development occurred on other land in the area. A large parcel adjacent to the land the Wallaces had purchased from the elder Cohans, that the elder Cohans had also owned and had sold to smother parly in 1965, was subdivided into one half acre home lots. Other homes were also built in the area. Local authorities responded to the increasing development with increasingly restrictive regulation of land use.
In 1990, the Wallaces filed a subdivision plan for their property. According to the Wallace brothers’ deposition testimony, they did so not intending actually to develop the property, but rather in order to “obtain a regulatory approval that would lock in value” so as to “preserve the value of their land against the growing encroachments" of regulation. The subdivision plan was not approved, and an appeal from that decision was pending as of the time of argument on the present motions.[6]
The Wallaces stopped vacationing on Martha’s Vineyard in approximately 1995, and established vacation homes in Maine. They attribute this change to “vitriolic attacks in the local press and increased frustration with traffic and congestion.” In 1996 and subsequent years, they rented out two of the houses on their Martha’s Vineyard properiy for the entire summer season. Although those houses were not *439 otherwise occupied during those years, Monte Wallace testified at his deposition that rental has not been their primary use, but rather “as a stopgap to help cover expenses while we can’t sell the thing.” The younger Cohans have acknowledged that they too have rented their houses, “in the summertime when we weren’t there sometimes," but no evidence indicates that either of the Cohan homes has been rented through any entire summer season, or has been occupied solely by renters during any season.
The Wallaces offer evidence, in the form of expert opinion, that their property, including the buildings on it, has a present market value of approximately $75,000 per acre. The Cohans offer expert opinion contesting the validity of that valuation, but they do not dispute that the present market value of the land substantially exceeds the per acre price set in the agreement.[7]
DISCUSSION
This Court grants summary judgment where there are no genuine issues of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears “the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue.” Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact.” Id. at 17. Where both parties have moved for summary judgment and “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the parly entitled to judgment as a matter of law. Cassesso, 390 Mass. at 422.
1. Enforceability of the Reciprocal Preemptive Purchase Provision.
“Restraints upon alienation, as a matter of public policy, are not favored.” Bowen v. Campbell, 344 Mass. 24, 26 (1962); see Eastern Marble Co. v. Vermont Marble Co., 236 Mass. 138, 153-54 (1920). Nevertheless, “(r]easonable restraints maybe enforced.” Franklin v. Spadafora, 388 Mass. 764, 766 (1983). There can be no doubt that the preemptive purchase provision in issue here is a restraint on alienation, since it effectively prevents the Wallaces from selling their land at its market value until the expiration of its term. See Coleman v. Tenney, Land Court No. 182466 (Cauchon, C. J.) (October 18, 1993), and authorities cited. The question, then, is whether the restraint is reasonable under the circumstances of this case.
The Supreme Judicial Court has evaluated reasonableness based on the factors set forth in the Restatement of Property, comment i (1944). Franklin v. Spadafora, 388 Mass. at 766.[8] Three of the six factors set forth there as supporting reasonableness are present in this case, along with one of the five factors indicating unreasonableness.
The first factor supporting reasonableness is that “the one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint.” Id. Here, the younger Cohans continue to own, and to use for vacation purposes, land abutting the land affected by the restraint. Enforcement of the restraint serves to protect their interest in preserving the undeveloped environment surrounding their vacation homes. In this respect, this case is significantly different from Coleman v. Tenney, supra, in which the holder of the preemptive purchase right owned no land in the vicinity.
The second Restatement factor is whether the restraint is limited in duration. Here, under the agreement the restraint lasts for a fixed term of forty years, twenty-nine of which have now passed. Its duration is further limited by the condition that the party seeking to exercise the preemptive purchase right continue to own property referred to in the agreement; thus, the provision remains in effect for not more than forty years, and possibly less. Forty years is a long time, long enough to encompass substantial change in general economic and social conditions as well as in the interests and preferences of particular land owners. But it is a fixed, limited period, around which the parties can plan. The parties cite decisions from various jurisdictions upholding or invalidating restraints of longer or shorter duration. Having reviewed the decisions cited, this Court discerns no generally applicable time limit; to the extent that the cases reveal a rule, it is that the duration of the restraint is one factor to be weighed, with all the other facts of the particular case, in determining the overall reasonableness of the restraint.
The plaintiffs assert that the forty year period would exceed the time permitted under the common law rule against perpetuities, since the agreement designates no measuring life in being as of the time of its execution. Certified Corp. v. GTE Products Corporation, 392 Mass. 821, 825-26 (1984) (perpetuities period is twenty-one years from date of agreement, where agreement identifies no measuring life). In Massachusetts, however, the common law rule has been superceded by statute, G. L. c. 184A, §11, which sets a ninety year maximum for nonvested property interests that do not otherwise satisfy the rule. G.L.c. 184A, §1 (a)(2). Forty years is thus well under the limit set by the legislature.
The third Restatement factor is whether the restraint accomplishes a worthwhile purpose. In analyzing this factor in Franklin v. Spadafora, 388 Mass. at 769, the Supreme Judicial Court defined the inquiry as whether the objective served “is against public policy or in itself not worthwhile.” The Court further *440 noted that the objective involved in that case was not prohibited by statute. Thus, to demonstrate this factor a party seeking to enforce a restraint need not show that the restraint affirmatively serves some important public goal. Rather, it is sufficient to show that the purpose served is not contrary to public policy or prohibited by law.
Here, despite the parties’ varying characterizations of the mental states of the signers of the agreement in 1969, the objective actually achieved by the provision in dispute is readily apparent in its terms and in the context: the provision gives each of the Cohan and Wallace families the power to ensure that it can continue to vacation in undeveloped surroundings for as long as it chooses, up to forty years, unhampered by development of the other family’s neighboring land. Upon the transfer of the elder Cohans’ land to the Wallaces, the Cohan and Wallace families owned neighboring vacation property in pristine surroundings. Each intended to continue vacationing on the property, and each preferred to do so in surroundings unchanged from that condition, notwithstanding the opportunity to realize higher monetary value through development. As long as both families continued to vacation there, and continued to prefer such surroundings, their interests would coincide, and each could count on the other to refrain from development. Should one family cease its vacation use, however, financial incentives would tend to prevail, and the other family’s preferred vacation conditions would be threatened. The preemptive purchase provision serves to protect each family from this possibility: within the forty year duration of the provision, as long as one of the two families continues to summer on its property, it has the power to prevent development of the neighboring land by asserting its right to purchase that land, ahead of any other buyer, at the price fixed in the agreement. The greater the disparity between that price and the market, the less likely any sale becomes, and accordingly the more effective the bar to development for the duration of the forty years.[9]
The protection of neighboring property owners from the adverse effects of development undesirable to them is neither contrary to public policy nor prohibited by law. It is true, as plaintiffs point out, that control of development is a matter of public concern, and is being vigorously addressed on Martha’s Vineyard by the responsible public agencies. See Johnson v. Edgartown, 425 Mass. 117 (1997). But nothing in the record suggests a determination by any public authority that the public good requires development of this land prior to 2010, such that its prevention in the service of private interests would undermine any public goals. Thus, enforcement of the restraint accomplishes a worthwhile purpose. In this respect, too, this case differs from Coleman v. Tenney, supra, in which the Court determined that the restraint served no legitimate purpose.
Thus, the first three of the Restatement factors favoring enforcement of the restraint exist here. The other three, however, do not. The fourth and fifth factors are closely intertwined; the provision restrains alienation to all potential buyers outside the Wallaces’ own family, and thereby prohibits nearly all conveyances, including those likely and those not likely to be employed by the Wallaces. While implementation of the original subdivision plan may be blocked by regulatory disapproval, regardless of the agreement, the undisputed facts establish a high likelihood that the plaintiffs would transfer the property by some means, whether through a revised subdivision plan or otherwise, if not for this agreement. The sixth factor, that the party to be restrained is a charity, clearly does not apply.
Of the five Restatement factors supporting a finding of unreasonableness of the restraint, the first two clearly do not apply; nothing in the facts suggests that the restraint is capricious or is imposed for spite or malice. The third, fourth, and fifth are the inverse of the first, second, and fourth factors discussed supra; the ones imposing the restraint, that is, the younger Cohans, own land benefitted by it; the duration of the restraint is long but not unlimited; but the number of persons to whom alienation is effectively prohibited is large.
As the comment to the Restatement indicates, this list of factors is not exhaustive. “Each case must be thoroughly examined in the light of all the circumstances to determine whether the objective sought to be accomplished by the restraint is worth attaining at the cost of interfering with the freedom of alienation.” Restatement §406, comment i; Franklin v. Spadafora, 388 Mass. at 766. Here, two additional factors weigh in favor of enforcement. First, the restraint arises from a contract, rather than a gift or other transfer. The parties, all sophisticated people represented by counsel, each freely chose to accept its burdens in return for the benefits of the reciprocal restraint imposed on the others. Thus, enforcement of the provision serves not only the individual interests for which it was devised, but the public interest in enforcement of contracts.[10] Second, the plaintiffs, who now seek to invalidate the provision, have asserted rights under it and benefitted from it repeatedly during its term. Estoppel may not save an otherwise invalid restraint, but the equities between the parties are among the facts that may be considered in assessing reasonableness.
Based on all of these factors, and having considered all of the circumstances of this case, this Court concludes that the reciprocal preemptive purchase provision in issue here is reasonable and therefore enforceable. Accordingly, the defendants are entitled to summary judgment on the parties’ claims for declaratory judgment.
*441 2. The Counterclaim for Breach of the Prohibition Against Rental Use.
The defendants seek partial summary judgment on their counterclaim, establishing the plaintiffs’ liability for breach of the provision of the agreement barring use of residences on the property “primarily for the production of rental income.” The undisputed facts, as set forth supra, establish that the plaintiffs have violated that provision, in that they have rented out their houses on the property for the entire summer season in each of the last three years, making no other use of those houses during those years. Accordingly, the defendants are entitled to summary judgment as to liability on their counterclaim.
It remains to be determined, however, what remedy is appropriate for this breach of contract. The defendants assert that they are entitled to “appropriate damages and equitable relief.” The present record does not indicate what damages, if any, the defendants have suffered as a result of the rental of the plaintiffs’ houses, nor does the record address the balancing of interests necessarily required for the issuance of any equitable relief. In this regard, it is worth noting that specific enforcement of this part of the agreement by means of an injunction against renting, combined with enforcement of the reciprocal preemptive purchase provision, would effectively deprive the plaintiffs of any use of their property for the next eleven years. Such an outcome, in this Court’s view, would be justified only on a showing that the plaintiffs’ renting of their property imposes very substantial adverse effects on the defendants, which cannot be remedied adequately by any less drastic form of relief. Further proceedings will be necessary to address these issues.
CONCLUSION AND ORDER
For the reasons stated, it is hereby ordered that the Plaintiffs’ Motion for Summary Judgment is DENIED, and the Motion of Counterclaim and Third-Party Plaintiffs for Partial Summary Judgment (as to Counts IV and VII) is ALLOWED.

Although the parties have cross-moved for summary judgment, each asserting the absence of any dispute of material fact, the record reveals considerable disagreement on certain factual matters, particularly the motivations and intentions of the participants in various events, and the value of the land in 1969 and at present. Neither side has argued that these differences are material, and the Court concludes that they are not.

 The plaintiffs, and the land, are the same as in Johnson v. Edgartown, 425 Mass. 117 (1997).

The precise structure of the ownership is more complicated, but is not material: it is undisputed that the Wallace brothers and their families are the natural persons whose interests are ultimately at stake in this dispute.

 The Wallaces paid the elder Cohans one million dollars for 151 acres, amounting to $6,623 per acre.

 Counsel informed the Court at argument of an anticipated resolution of that appeal through an agreement under which the Martha’s Vineyard Commission would approve an alternative subdivision plan involving fewer house lots.

 Defendants responded to a request for admissions by admitting that “(b]ut for the restriction contained in . . . the Agreement, the current market value of the land covered by the Agreement, on average, would exceed $18,000 per acre.

The plaintiffs invoke the Restatement (Second) of Property: Donative Transfers, §4.2. As the defendants point out, that section by its terms applies only to restraints arising from donative transfers, not to those arising from contracts.

The Wallaces admit that this is exactly how they intended the preemptive purchase provision to operate. The only surprise to them is that it was they, rather than the Cohans, who changed their minds as to their preferred use of the property, ceasing their vacation use and seeking instead to maximize its economic value.

In this respect, too, this case differs from Coleman u. Tenney, in which the restraint arose from an apparently one-sided agreement, under which the property owner apparently received nothing in return for accepting the restraint.